J-S19017-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: I.R., A MINOR | : IN THE SUPERIOR COURT OF<br>: PENNSYLVANIA<br>: |
| APPEAL OF: K.H., MOTHER | :<br>:<br>:<br>:<br>:<br>:<br>:<br>: No. 178 WDA 2026 |

Appeal from the Order Entered January 6, 2026
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-0000103-2024

| | |
|---|---|
| IN THE INTEREST OF: A.R., A MINOR | : IN THE SUPERIOR COURT OF<br>: PENNSYLVANIA<br>: |
| APPEAL OF: K.H., MOTHER | :<br>:<br>:<br>:<br>:<br>:<br>:<br>: No. 179 WDA 2026 |

Appeal from the Order Entered January 6, 2026
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-0000102-2024

BEFORE: SULLIVAN, J., NEUMAN, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY NEUMAN, J.: **FILED: JULY 27, 2026**

K.H. ("Mother") appeals from the orders entered on January 6, 2026, in the Court of Common Pleas of Allegheny County, Orphans' Court Division, which granted the petitions filed by Allegheny County's Office of Children Youth and Families ("OCYF"), seeking the involuntary termination of Mother's

---

[*] Former Justice specially assigned to the Superior Court.

parental rights to her son, I.R., and her daughter, A.R. (collectively "Children").[1, 2]  We affirm.

Mother has three biological children: I.H. (born in April of 2017);[3] I.R. (born in November of 2018); and A.R. (born in August of 2020).  OCO at 1. OCYF first became involved with this family on February 9, 2022, after receiving a referral alleging I.H. was a victim of sexual abuse.  *Id.*[4]  When OCYF went to Mother's home to investigate the claim, they found the home to be "in deplorable condition[,"] with no functioning bathtub or toilet and inadequate food.  *Id.*  There were also concerns of intimate partner violence ("IPV") and substance abuse.  *Id.*  Children were removed from Mother's care and initially placed with Father, who was living with his paternal aunt at the time.  *Id.* at 1-2.  However, in May of 2022, after Father "lost this housing[,]"

_____

[1] We *sua sponte* consolidated the appeals at Nos. 178 & 179 WDA 2026, pursuant to Pa.R.A.P. 513, as they involve related parties and issues.  *See Per Curiam* Order, 2/18/26 (single page).  Additionally, we note OCYF filed nearly identical termination petitions in each of the underlying matters, one for each child.  For ease, we refer to the petitions in the singular.  Likewise, where the orphans' court entered nearly identical orders in each underlying matter, we refer to such orders in the singular.

[2] The parental rights of Children's father, G.R. ("Father"), were also terminated on the same date; however, Father is not a party to this appeal.

[3] J.S. is the alleged father of I.H.  *See* OCYF's Exhibit 1 at 13 (Order of Adjudication and Disposition, 6/1/22, at ¶ 5(b)) (indicating J.S.'s paternity as to I.H. has not been established).  I.H. is not subject to these proceedings. *See* Orphans' Court Opinion ("OCO"), 2/27/26, at 1 n.1.

[4] The Child Protective Services Child Line report was ultimately deemed unfounded.  *See* Petition for Involuntary Termination of Parental Rights ("Petition"), 11/8/24, at ¶ 8.

Children were removed from his care and placed with their maternal grandmother. *Id.* at 2.[5]

On May 31, 2022, Children were adjudicated dependent, and the orphans' court directed Children were to remain in the care of their maternal grandmother. *Id.* The orphans' court ordered Mother to undergo a POWER drug and alcohol evaluation, attend IPV treatment, work with in-home services, and submit to random drug screens. *Id.* A permanency review hearing was held on August 22, 2022, at which Mother was found to be "in substantial compliance and to have made substantial progress." *Id.* The orphans' court ordered her to continue working with in-home services, attend dual diagnosis treatment and undergo random drug screens, and continue IPV counseling. *Id.* Mother was also permitted to have unsupervised visitation with Children. *Id.*

The orphans' court continued to conduct regular permanency review hearings from December 2022 through February 2025. *See id.* at 2-3. At the December 2, 2022 review hearing, Mother was found to be moderately compliant with her family plan and to have made minimal progress with her permanency goals. *Id.* at 2. The orphans' court directed her to obtain an updated POWER evaluation, submit to random drug screens, and attain

---

[5] According to OCYF, Father's aunt "contacted the agency and reported … [Father] was no longer able to reside in the home, as he was not assisting in the care of the [C]hildren…[,] and [she] reported concerns of alcohol use…." N.T., 12/15/25, at 31; *see also id.* (indicating Father was unable to find other stable housing).

appropriate housing. *Id.* It also determined Mother's visits were to be supervised. *Id.* At the April 3, 2023 review hearing, Mother was again found in moderate compliance with her plan. *Id.* She was ordered to engage in mental health treatment, submit to random urine screens, and attend coached visitation. *Id.* Visits were to remain supervised, and Children were ordered to remain in their placement with maternal grandmother. *Id.* At subsequent review hearings conducted on June 15 and September 11, 2023, Mother remained moderately compliant and was permitted "loosely supervised" visitation. *Id.*

Beginning in December of 2023, and continuing through February of 2025, the orphans' court found Mother to be only minimally compliant with her family plan and found she made only minimal progress toward her permanency goals. *Id.* at 3; *see also id.* at 3-4 (reflecting Mother's court-ordered goals remained the same throughout this period). Mother's visitation was to be supervised. *Id.* at 3. On January 27, 2024, Children were placed in the care of their maternal great aunt and great uncle (referred to herein sometimes as "foster parents"). OCYF's Exhibit 1 at 60 (Permanency Review Order, 2/16/24, at 3). At each subsequent review hearing, the orphans' court ordered Children to remain in their current kinship placement with the foster parents. OCO at 3.

On June 25, 2024, the orphans' court determined aggravated circumstances existed as to Mother, finding Mother had not had significant contact with Children since November 2023. *Id.* On October 22, 2024, the

- 4 -

orphans' court reduced Mother's weekly visitation to "every other week." ***Id.***; OCYF's Exhibit 1 at 89 (Order Granting Motion to Reduce Visits, 10/22/24, at 1). The orphans' court relieved OCYF of its reasonable efforts to attempt reunification on November 20, 2024. OCO at 3.

On November 8, 2024, OCYF filed its petition seeking the involuntary termination of Mother's parental rights to Children pursuant to Sections 2511(a)(1), (2), (5), (8), and (b) of the Adoption Act, 23 Pa.C.S. §§ 2101-2938. The orphans' court appointed Children's guardian *ad litem* ("GAL") from the dependency proceedings to represent them in the termination matter.[6] A termination hearing was originally scheduled for July 18, 2025, and was continued to December 15, 2025, at Mother's request. ***See*** Motion to Continue Contested TPR Hearing, 7/10/25, at ¶¶ 3-6 (averring the court-ordered psychological evaluations have not yet been received; requesting

---

[6] ***See*** Order, 2/11/25, at 1-2 (appointing KidsVoice as Children's legal counsel in the termination proceeding); ***see also*** OCYF's Exhibit 1 at 19 (Order Appointing Guardian *Ad Litem*, 6/28/22, at 1) (appointing KidsVoice as Children's GAL in the dependency proceeding). "[W]here an orphans' court has appointed a GAL/Counsel to represent both the child's best interests and legal interests, appellate courts should review *sua sponte* whether the orphans' court made a determination that those interests did not conflict." ***In re Adoption of K.M.G.***, 240 A.3d 1218, 1235 (Pa. 2020); ***see also*** 23 Pa.C.S. § 2313(a) (mandating counsel be appointed to represent a child in a contested termination proceeding). Here, the orphans' court expressly stated "no conflict exists" that would prevent KidsVoice from representing both Children's best interests and legal interests in this matter. Order, 2/11/25, at 1. Our Supreme Court has held, "when a child's best interests and legal interests do not diverge, … a court-appointed attorney may serve in the dual capacity of [GAL] and legal counsel…." ***In re P.G.F.***, 247 A.3d 955, 964 (Pa. 2021). Thus, we conclude the orphans' court fulfilled the mandates of ***K.M.G.*** and Section 2313(a).

additional time to obtain evaluations and prepare for the contested hearing). At the December 15, 2025 hearing, OCYF presented the testimony of several caseworkers and a licensed psychologist. Mother testified on her own behalf. We summarize the testimony of the parties' witnesses, in pertinent part, as follows.

OCYF caseworker Kaitlyn Augustine testified as to the circumstances which led to Children's removal from Mother's care, stating OCYF had concerns regarding the condition of the home,[7] IPV, and substance abuse. N.T. at 31. During the six months prior to the filing of the termination petition, Ms. Augustine relayed Mother attended six visitations with Children. *Id.* at 34.[8] During that same timeframe, Mother did not send Children any cards, letters, gifts, or support, nor did she ask to visit Children or inquire about them. *Id.* Ms. Augustine explained that in order to reunify with Children, Mother had been court-ordered to "[o]btain stable housing, complete a drug and alcohol assessment, complete random urine screens, complete [IPV] classes, visit with the [C]hildren, … [and c]omplete mental health treatment." *Id.* Yet, Mother did not satisfy any of those goals prior to the filing of OCYF's Petition.

---

[7] OCYF observed cigarette butts, stray diapers, trash, food on the floor, the Children being visibly dirty, the bathtub and toilet not working, exposed sewage, and no food in the home. N.T. at 31.

[8] According to Brie Zarotney, the assistant director of transportation at Second Chance, Mother was scheduled for "22 to 29 visits" with Children from May 2024 through October 2024, but she only attended six of those visits. N.T. at 16.

*Id.* at 35; *see also id.* at 35-36 (confirming aggravated circumstances were found as to Mother due to her lack of consistent contact with Children).

Ms. Augustine recalled Children were initially placed with their maternal grandmother from May 3, 2022, through January 26, 2024, after which they were placed with their maternal great aunt and uncle. *Id.* at 36-37. Ms. Augustine visits Children monthly in their foster home and reported Children are "doing well" there. *Id.* at 37. She has observed Children's interacting positively with their foster parents and calling them "mom and dad." *Id.* There are three other children in the home, and Children interact with them like typical siblings. *Id.* at 37-38. On February 9, 2024, the foster parents became the educational and medical decision-makers for Children. *Id.* at 38. Ms. Augustine indicated the foster parents are a pre-adoptive resource for Children; she has no concerns regarding the foster parents' care of Children. *Id.* (stating the foster parents are meeting Children's educational, psychological, and developmental needs).

Ms. Augustine reported Children had been in foster care for three years and seven months as of the termination hearing. *Id.* at 39. She believes Mother has had enough time to remedy the circumstances which led to Children's removal and testified OCYF offered Mother all available services to help her reunify with Children. *Id.* She opined termination would be in the best interest of Children, because Mother has had minimal contact with them during their three years and seven months in foster care and has failed to

complete the court-ordered services. *Id.* Children also need permanency. *Id.*

Dr. Beth Bliss, a licensed psychologist,[9] completed evaluations with the family and issued a report dated July 10, 2025. *Id.* at 64. After completing an individual evaluation of Mother on June 18, 2025, Dr. Bliss diagnosed Mother with "an unspecified personality disorder." *Id.* at 65. She explained Mother's personality disorder has "impacted her ability to meet the court's goals for regaining custody of … [C]hildren or to put … [C]hildren's needs ahead of her own needs or wants." *Id.* at 65-66. She recounted Mother's disclosing a history of IPV. *Id.* at 66. Dr. Bliss explained that children exposed to IPV are at risk of physical danger if they are present during any violent incidents, as well as increased behavioral issues, substance abuse concerns as they get older, and suicidality from witnessing violent relationships. *Id.* The emotional stress and fear associated with viewing IPV also impacts a child's mental health and causes them to be more likely to end up in violent relationships themselves, either as perpetrators or victims. *Id.* at 66-67.

Dr. Bliss recommended Mother continue with individual counseling to work on her personality traits and complete a coached parenting program "to help her better learn how to simultaneously attend to … [C]hildren, show them attention and affection, while also setting and maintaining limits with them."

_____

[9] Dr. Bliss testified as an expert in forensic psychology. *See* N.T. at 63.

*Id.* at 67. She did not believe Mother was in a position to care for Children on a full-time basis at the time of her evaluation. *Id.*

On June 18, 2025, Dr. Bliss completed an interactional evaluation of Mother and Children. *Id.* Regarding her observations of their interactions, she stated:

> [I.R.] … basically ignored his mother almost the entire appointment. He looked to share attention with me. Any time … he was excited by a toy, he looked up at me. If he needed help with something, he looked at me, he talked to me several times. He did not engage his mother in any way in that regard. In fact, … the only times … he showed [Mother] any attention or talked to her was on two occasions he … challenged her or questioned her.
>
> ***
>
> And [Mother] also didn't really attempt to engage him. He played by himself and she essentially ignored him and was mostly engaged with her daughter.
>
> [A.R.], on the other hand, was a very different presentation from [I.R.], so she was excited to greet her mother and was overheard saying, "mommy," and hugging her. She looked to share attention with her throughout the entire appointment.
>
> ***
>
> They both showed physical and verbal affection to one another, [A.R.] and [Mother]. But as the appointment progressed, [A.R.] was very hyperactive, d[y]sregulated, literally jumping off of a chair. And her brother was the one who corrected her. … [Mother] had a lot of difficulty setting or maintaining any limits with her as she became so d[y]sregulated.

*Id.* at 68-69 (some formatting altered).

Dr. Bliss expressed that she did not observe a bond between Mother and I.R., whereas she did observe a bond between Mother and A.R. *Id.* at 70. When asked to describe that bond, Dr. Bliss stated, "[A.R.] showed verbal and

physical affection. She looked to share attention with her mom. She enjoyed her time. But she was much more d[y]sregulated. So the attachment made was an insecure attachment but, at the same time, she did have a bond." ***Id.*** Dr. Bliss explained:

> There are different types of insecure attachments. So there's anxious or avoidant. Essentially with [A.R.'s] d[y]sregulated behavior, she was really seeking attention. She appeared to be insecure, feeling like she … needed to do whatever she could to get her mom's attention. She also questioned or challenged her mom a couple of times when her mom said she was going to be coming, asking if she was sure. So she seemed to be less certain of the consistency of her mom, if she can depend on her mom. But she wants to.

***Id.*** at 71 (formatting altered).

Dr. Bliss also conducted an interactional evaluation of Children and their foster parents on June 25, 2025. ***Id.*** During that evaluation, she observed both Children "looked to share attention with the [foster parents]" and appeared happy, playful, and excited to be there. ***Id.*** at 72. They were also "much more regulated…." ***Id.*** A.R. did not exhibit any hyperactivity or dysregulation during the evaluation. ***Id.*** Children referred to the foster parents as "mom and dad" and appeared "bonded" and "securely attached" to them. ***Id.*** at 72-73.

Dr. Bliss further conveyed I.R. appears to view his foster parents as his psychological parents;[10] however, A.R. might view both Mother and her foster

_____

[10] Dr. Bliss defined a 'psychological parent' as "the individual … the child feels is there to meet their needs, is attentive to them, is emotionally attuned to
*(Footnote Continued Next Page)*

parents as her psychological parents. *Id.* at 74. She does not believe I.R. would suffer any harm if Mother's rights were terminated. *Id.* Conversely, Dr. Bliss opined it would be "difficult" for A.R. if she no longer had contact with Mother. *Id.* Although she would not categorize the potential harm to A.R. as "extreme,"[11] and she explained A.R.'s relationship with her foster parents could help ameliorate A.R.'s sense of loss. *Id.* at 75. Dr. Bliss believes the Children need permanency and that the foster parents would be an appropriate adoptive resource. *Id.* at 76; *see also id.* at 77 (stating both Children have expressed liking where they live and feeling safe with the foster parents, but also indicated a desire to live with Mother); *id.* at 78 (proffering Children's security and stability with the foster parents would outweigh any potential negative effect of terminating Mother's parental rights).

Second Chance caseworker Oscar Ayala-Silva confirmed Children are doing well in their current placement and call their foster parents "mom and dad." *Id.* at 57 (noting Children appear happy and get along "quite well" with the other children in the home). He expressed no concerns regarding the foster parents' care of Children. *Id.* Likewise, OCYF caseworker Cheyenne Tatters testified Children are "thriving" in the foster home and are benefiting

---

them, is a stable presence in their life, and who they will turn to if they need comfort." OCYF's Brief at 11 n.8 (citing N.T. at 74).

[11] Dr. Bliss considered 'extreme harm' to be trauma rising to the level of causing post-traumatic stress disorder, inhibiting regular functioning, impacting daily functioning, or causing a disturbance in multiple areas of one's life for a significant period of time. N.T. at 89-90.

from having older cousins who they can "look up to for guidance." *Id.* at 100. She indicated the foster parents are a pre-adoptive resource for the Children and believes they are meeting Children's needs to the best of their ability. *Id.* at 101-02. Ms. Tatters further observed Children look to their foster parents as "mother and father figure[s]" and seek comfort from them. *Id.* at 102. She also conveyed Children have consistently told her they like living in the foster home and want to keep living there. *Id.* at 103-04. In Ms. Tatters' opinion, "[T]his is the best placement they have been in." *Id.* at 106 (noting the foster parents provide Children with love, support, and stability).

Finally, Mother testified that she appreciates how IPV, substance abuse, and unstable housing could have a negative impact on Children, and she acknowledged the goals set for her by the orphans' court were appropriate. *Id.* at 120-21. Regarding her efforts to work towards her goals, Mother indicated she signed a one-year residential lease for a home and has been living there by herself for the past four months. *Id.* at 121. She conveyed her home is currently clean, food is in the fridge, and "safety precautions on the plugs and baby gates" are in place. *Id.* at 122. As for her history of IPV, Mother testified she completed a program with the Women's Center & Shelter "at the end of 2023." *Id.* at 123. She stated her last incident of IPV was in January 2025 with Father as the perpetrator. *Id.* at 123-24. Regarding drugs and alcohol, Mother testified she has a medical marijuana card for anxiety, but indicated she only uses marijuana as prescribed and stores it in child-locked containers. *Id.* at 125-26; *see also id.* at 129 (Mother's testifying she

does not use any other drugs). Concerning her mental health, Mother said she attends biweekly counseling at Wesley and plans to continue to do so. *Id.* at 126, 128.

Mother further testified she engaged in coached parenting through Justice Works "[a]bout a year ago[,]" which she found helpful. *Id.* at 127-28. She acknowledged visiting Children only about once a month from June 2024 through November 2024, but claimed she engaged in daily phone calls with Children during that time. *Id.* at 130-31. When asked why she was only visiting Children about once a month, Mother said she was "visiting while [she] was able to[,]" and she "had a talk to smooth things over" with her aunt and uncle. *Id.* at 130; *see also id.* at 131 (Mother's claiming "we smoothed things over, so I could see [Children] more frequently"). Mother further stated she sometimes had to call off work to see Children and did not always have money to take the bus. *Id.* at 132; *see also id.* (indicating Mother does not have a car).

Mother thinks her ability to care for Children has improved. *Id.* at 134. She said she is now able "to pinpoint triggers and use [her] coping skills way better." *Id.* She claimed to have also improved her time management and organizational skills. *Id.* Mother believes Children need to maintain a relationship with her. *Id.* at 140. She claimed to have a bond with both Children and thinks severing that bond would be devastating to both of them. *Id.*; *see also id.* (stating Children keep asking Mother at recent visits "when they are coming home with mommy").

Following the parties' presentation of witness testimony, Children's

counsel advocated for the termination of Mother's parental rights, stating:

> [I.R.] is seven, and [A.R.] is five. I had the opportunity to speak with both of them about a week ago and had an age-appropriate conversation with them regarding adoption and what that would mean. Both of them had expressed a willingness and a desire to be adopted by their maternal aunt and uncle. They have been there for two years, and this is where … they feel comfortable.

*Id.* at 155.

The orphans' court took the parties' arguments under advisement, and

on January 6, 2026, it terminated Mother's parental rights to Children

pursuant to 23 Pa.C.S. §§ 2511(a)(1), (2), (5), (8), and (b). ***See*** Order,

1/6/26, at 1-2. Mother timely appealed and complied with Pa.R.A.P.

1925(a)(2)(i) (requiring a concise statement of errors complained of on appeal

be filed and served with the notice of appeal). In response, the orphans' court

filed a Rule 1925(a) opinion explaining the reasons for its decision. ***See***

***generally*** OCO at 4-9.

On appeal, Mother presents the following issues for our review:

1. Did the [orphans'] court abuse its discretion and/or err as a matter of law by involuntarily terminating Mother's parental rights pursuant to 23 Pa.C.S. §[]2511(a)(1)?

2. Did the [orphans'] court abuse its discretion and/or err as a matter of law by involuntarily terminating Mother's parental rights pursuant to 23 Pa.C.S. §[]2511(a)(2)?

3. Did the [orphans'] court abuse its discretion and/or err as a matter of law by involuntarily terminating Mother's parental rights pursuant to 23 Pa.C.S. §[]2511(a)(5)?

4. Did the [orphans'] court abuse its discretion and/or err as a matter of law by involuntarily terminating Mother's parental rights pursuant to 23 Pa.C.S. §[]2511(a)(8)?

5. Did the [orphans'] court abuse its discretion and/or err as a matter of law in concluding … CYF met its burden of proving by clear and convincing evidence that termination of Mother's parental rights would best serve the needs and welfare of I.R. and A.R. pursuant to 23 Pa.C.S. §[]2511(b)?

Mother's Brief at 8-9.

Our standard of review is well-established:

The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *In re Adoption of S.P.*, 47 A.3d 817, 826 (Pa. 2012). "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id.* "A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id.* The trial court's decision, however, should not be reversed merely because the record would support a different result. *Id.* at 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. *See In re R.J.T.*, 9 A.3d [1179,] 1190[ (Pa. 2010)].

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (cleaned up). "[T]he trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re Q.R.D.*, 214 A.3d 233, 239 (Pa. Super. 2019) (citation omitted).

Section 2511 of the Adoption Act governs the termination of parental rights and requires a bifurcated analysis. *See In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). We have explained:

- 15 -

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*Id.* (cleaned up). We need only agree with the orphans' court as to any one subsection of Section 2511(a), as well as Section 2511(b), to affirm an order terminating parental rights. *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

We consider the involuntary termination of Mother's parental rights under Sections 2511(a)(1) and (b), which provide:

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

\*\*\*

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any

efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(1), (b).

We begin by addressing whether the orphans' court abused its discretion by terminating Mother's parental rights pursuant to Section 2511(a)(1).

To satisfy Section 2511(a)(1), the moving party must produce clear and convincing evidence of conduct sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties.

*In re C.M.S.*, 832 A.2d 457, 461 (Pa. Super. 2003) (citation omitted); *see also In re Adoption of C.M.*, 255 A.3d 343, 364 n.12 (Pa. 2021) ("The law does not require a settled purpose of relinquishing a parental claim **and** a refusal to perform parental duties, but one or the other.") (emphasis in original).

Regarding parental duties, our Supreme Court has explained:

There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this [C]ourt has held … the parental obligation is a positive duty which requires affirmative performance.

This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.

Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life.

- 17 -

***C.M.S.***, 832 A.2d at 462 (quoting ***In re Burns***, 379 A.2d 535, 540 (Pa. 1977)) (cleaned up). "A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship." ***In re B., N.M.***, 856 A.2d 847, 855 (Pa. Super. 2004) (citation omitted). "Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs." ***Id.*** (citation omitted).

In assessing evidence under Section 2511(a)(1), orphans' courts should consider the whole history of the case and not mechanically apply the six-month statutory provision. ***See In re I.J.***, 972 A.2d 5, 10 (Pa. Super. 2009). However, our Supreme Court has reinforced "the six-month period immediately preceding the filing of the petition is the **most** critical period to evaluate for affirmative conduct or its absence…." ***C.M.***, 255 A.3d at 367 (emphasis in original). Moreover, "[t]he trial court must examine the individual circumstances of each case and consider all of the explanations of the parent to decide if the evidence, under the totality of the circumstances, requires involuntary termination." ***I.J.***, 972 A.2d at 10 (citation omitted). A finding that a parent has refused or failed to perform parental duties "will not be predicated upon parental conduct which is reasonably explained or which resulted from circumstances beyond the parent's control[,]" but may "only result when a parent has failed to utilize all available resources to preserve

the parental relationship." ***In re Adoption of L.A.K.***, 265 A.3d 580, 592 (Pa. 2021) (citing ***Burns***, 379 A.2d at 540).

Instantly, Mother claims the orphans' court failed to provide sufficient evidence to support termination of her parental rights under Section 2511(a)(1). Mother's Brief at 18. She argues the evidence presented clearly established Mother maintained consistent visitation with Children during the six months immediately preceding the filing of OCYF's Petition. ***Id.*** at 25; ***see also id.*** (averring Mother attended scheduled visits with Children in June, July, August, and September of 2024, and participated in daily telephone or video calls with Children). Additionally, Mother argues the orphans' court failed to consider the barriers she described which prevented her from maintaining more frequent contact with Children. ***Id.*** at 26; ***see also id.*** (stating Mother's strained relationship with the foster parents, as well as her employment and insufficient assistance with bus transportation, were hindrances to her maintaining consistent contact with Children). Mother's claims are belied by the record.

The evidence establishes that during the six months prior to the filing of the termination Petition, Mother attended **only six** of "22 to 29" scheduled visits. ***See*** N.T. at 16, 34. In fact, during that timeframe, the orphans' court found aggravated circumstances existed as to Mother due to her lack of consistent contact with Children. ***See*** OCO at 8. Moreover, she did not send any cards, letters, gifts, or support to Children, nor did she inquire about them or ask to see them. ***Id.*** As for Mother's purported barriers to maintaining

- 19 -

contact with Children, the orphans' court heard Mother's testimony firsthand, and it opined, "Mother never provided … an acceptable reason for missing visits and failing to stay in contact with the [C]hildren…." *Id.* "On issues of credibility, it is not our role as an appellate court to reweigh the evidence and substitute our judgment for the factfinder…." *In re Estate of Grigg*, 324 A.3d 40, 45 (Pa. Super. 2024); *see also Q.R.D.*, 214 A.3d at 239 ("[T]he trial court is free to believe all, part, or none of the evidence presented….").

Additionally, the orphans' court noted Mother's goals have remained the same throughout the history of this case. OCO at 7. Although Mother was able to maintain periods of stability early on, the court found she has struggled to maintain her goals long term. *Id.* "She has not been able to obtain stable housing,[12] has not addressed her mental health issues[,] and has not successfully completed her [IPV] goals." *Id.*; *see also id.* (finding Mother has been only minimally compliant with her court-ordered goals since December 2023). The orphans' court conveyed it is most concerned with Mother's mental health and her lack of consistent treatment, emphasizing the negative effect Mother's personality disorder could have on her ability to

_____

[12] We acknowledge Mother's testimony regarding her current housing situation; however, we are not permitted to consider said testimony, as she did not obtain the housing until **after** the filing of OCYF's Petition. *See* N.T. at 121 (Mother's testifying she signed a one-year lease and has been residing in the home for the past four months); *see also* 23 Pa.C.S. § 2511(b) ("With respect to any petition filed pursuant to subsection (a)(1), … the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.").

- 20 -

parent. *Id.* (citing Dr. Bliss's testimony regarding the effect of Mother's particular diagnosis on her ability to parent). It stated, "These disorders are pervasive and require long-term, consistent mental health treatment." *Id.* "Mother's last-minute attempt to engage in mental health treatment bi-monthly does not satisfy her goal of addressing her mental health issues." *Id.* at 7-8.

The orphans' court further expressed its concern for Mother and Children regarding IPV. It opined:

> Mother was the victim of [IPV] on at least two occasions, so it was important that she both attend treatment and make changes to her functioning as it related to choosing romantic partners. Mother was referred for [IPV] treatment in May of 2022 and May of 2024. It appears … Mother did complete one course of [IPV] sessions at The Women's Center and Shelter in 2023. However, she was involved in an incident of [IPV] in January of 2025. While Mother did make attempts to comply with this goal by attending treatment, she has not made the changes necessary to complete the goal successfully.

*Id.* at 8; *see also id.* at 9 (noting Mother's mental health and her history of IPV both have the potential to create unsafe and unstable conditions in the family home). Thus, the orphans' court concluded, "Mother has not prioritized … [C]hildren's safety needs and has been unable to provide the stability … young … children require." *Id.* "Mother is either uninterested or unable to assume full-time parenting duties." *Id.*

Based on the foregoing, the record supports the orphans' court's determination Mother failed to perform her parental duties for a period in excess of six months prior to the filing of the termination petition as required

by Section 2511(a)(1).  *See C.M.S.*, 832 A.2d at 462.  Her parental duty required her to exert herself to take and maintain a place of importance in Children's lives.  *See id.*  Mother did not do so.  Instead, she exhibited minimal effort to visit with Children while the foster parents provided for them and met all their physical and emotional needs.  *See id.*  The certified record further evinces Mother's unwillingness to participate in the recommended resources which were necessary for her to achieve reunification with her Children.  As such, under the totality of the circumstances, we discern no error of law or abuse of discretion by the orphans' court in determining OCYF satisfied their burden of establishing termination under Section 2511(a)(1).

As we have determined the evidence supported the involuntary termination of Mother's parental rights under Section 2511(a)(1), we next consider Section 2511(b).  With respect to Section 2511(b), our Supreme Court has explained:

> [C]ourts should consider the matter from the child's perspective, placing [the child's] developmental, physical, and emotional needs and welfare above concerns for the parent.
>
> Accordingly, the determination of the child's particular developmental, physical, and emotional needs and welfare must be made on a case-by-case basis.  We have observed the law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved.  Thus, the court must determine each child's specific needs.
>
> Moreover, the child's emotional needs and welfare include intangibles such as love, comfort, security, and stability.  As further guidance, we have identified factors, *i.e.*, specific needs and aspects of the child's welfare, that trial courts must always consider.  The court must consider whether the children are in a

pre-adoptive home and whether they have a bond with their foster parents. And, if the child has any bond with the biological parent, the court must conduct an analysis of that bond, which is not always an easy task.

*Interest of K.T.*, 296 A.3d 1085, 1105-06 (Pa. 2023) (cleaned up).

Here, Mother claims the orphans' court erred or abused its discretion in finding termination was warranted under Section 2511(b). Mother's Brief at 34. She contends there is insufficient evidence to establish termination of Mother's parental rights would best serve the needs and welfare of Children. *Id.* at 35. To the contrary, she argues "[t]here was ample evidence to show A.R. has a beneficial and necessary relationship with Mother and that the relationships … I.R. and A.R. have with Mother should be preserved to best serve [their] needs and welfare…." *Id.* at 36. No relief is warranted on this claim.

In conducting its best interest analysis, the orphans' court "examined the nature of the bond between Mother and … [C]hildren and the effect of severing this bond. The court also considered the respective safety needs of … [C]hildren[,] as well as their relationship with the foster parents." OCO at 8. In doing so, it observed:

> Dr. Bliss reported … I.[R.] exhibited no bond whatsoever with Mother. The doctor opined … A.R. shared a bond with her Mother but … the attachment between the two was insecure. … Children have been in the care of the maternal great aunt and uncle since January 2[7,] 2024. The OCYF caseworker, [Ms.] Augustine, reported … Children are doing well in their foster home and refer to the foster parents as "mom" and "dad." Dr. Bliss completed an interactional evaluation of the foster parents and … Children. She opined … Children were bonded with the foster parents and … they shared a secure attachment with them. Dr. Bliss testified … A.[R]

could experience some difficulty if her relationship with her Mother would cease. However, she reported … the difficulties would not be extreme and … her relationship with her foster parents could help ameliorate whatever issues resulted from the loss.

*Id.* at 8-9 (cleaned up). Hence, the orphans' court found "neither child would suffer extreme emotion[al] consequences if Mother's parental rights were terminated." *Id.* at 9. It added, "The court does not believe … Mother is capable of meeting all … Children's needs if they were returned to her care. … Children are in a stable, long-term placement." *Id.* (cleaned up). Accordingly, it determined terminating Mother's parental rights best serves the needs and welfare of Children.

OCYF agrees. It argues:

Children deserve the commitment of a parent who provides a safe environment for them. Primarily, that is stable housing, free from drugs and IPV. Mother never demonstrated commitment to these goals, which generally is done … through completion of court-ordered services. There is no bond between I.R. and Mother, and there will be no harm to I.R. if Mother's parental rights are terminated. A.R. is bonded to Mother with an insecure attachment. As a result, there will be some difficulty for A.R. if Mother's parental rights are terminated, but Dr. Bliss would not categorize this difficulty as extreme.

Both Children are bonded and securely attached to their foster parents. … Children looked to share attention with their foster parents; they were engaged, happy, playful, and regulated. … Children referred to their foster parents as mom and dad. Additionally, both Children view their foster parents as their psychological parents. The foster parents are meeting all … Children's needs, and … Children are thriving in their care. Accordingly, the record is replete with evidence that the best interests of … Children were served by termination of Mother's parental rights.

OCYF's Brief at 27-28 (cleaned up).

Likewise, Children's counsel argues:

Children were removed from Mother's care in April of 2022. Since then, … Children have never been returned to Mother. Mother has not served in a primary caretaker role for … Children, nor have … Children relied on Mother to meet their daily developmental, physical, or emotional needs, for over three and a half years. … Children are clearly in need of permanency in a safe, stable, and loving home. [They] have found this permanency with their foster parents.

… Children are very comfortable in their pre-adoptive foster home. … Children's foster parents have consistently met all … Children's educational, psychological, and developmental needs. Dr. Bliss found … Children to be securely attached to their foster parents and that … Children view their foster parents as their psychological parents.

Children's Brief at 32-34 (cleaned up).

Based on the foregoing, the record demonstrates the termination of Mother's parental rights will serve the developmental, physical, and emotional needs and welfare of Children. Therefore, we discern no abuse of discretion by the orphans' court in terminating Mother's parental rights pursuant to Section 2511(b).

Accordingly, we affirm the orphans' court's January 6, 2026 orders involuntarily terminating Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1) and (b).

Orders affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 7/27/2026